UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| JOSEPH EDWIN HARJU,<br><br>PLAINTIFF,<br><br>v.<br><br>PHILIP MORRIS USA INC., R. J. REYNOLDS TOBACCO COMPANY, BROWN AND WILLIAMSON TOBACCO CORPORATION, B.A.T. INDUSTRIES P.L.C., BRITISH-AMERICAN TOBACCO COMPANY LIMITED, B.A.T. (U.K. AND EXPORTS) LIMITED, LORILLARD TOBACCO COMPANY, LIGGETT GROUP INC., THE COUNCIL FOR TOBACCO RESEARCH-U.S.A. INC., AND THE TOBACCO INSTITUTE, INC.,<br><br>DEFENDANTS. | Case No. CV 01-2336 DWF/RLE<br><br>**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BASED ON THE EXPIRATION OF THE STATUTE OF LIMITATIONS AND THE LACK OF PROOF OF CAUSATION**<br><br>**ORAL ARGUMENT REQUESTED ON JULY 22, 2004** |

## I. INTRODUCTION

Mr. Harju's remaining claims should be dismissed in their entirety for two reasons: (1) they fall outside the applicable six-year statute of limitations, see Minn. Stat. § 541.05;[1] and (2) there is no genuine issue as to any material fact on the issue of causation because Mr. Harju has failed to submit expert reports to establish causation.

First, with regard to the statute of limitations, each of the remaining causes of action accrued no later than 1990 because Mr. Harju had physical manifestations of his alleged injuries

[1] As this Court knows, Counts II, III, IV, V, VI, and VII of Mr. Harju's Complaint have already been dismissed. See Report & Recommendation, February 12, 2003, Docket Entry No. 37; Order, September 10, 2003, Docket Entry No. 51. The only remaining claims are an alleged special duty claim (Count I) and a conspiracy claim (unnumbered count).

by that time, and because Mr. Harju had sufficient evidence – from a variety of sources – of a causal connection between his alleged injuries and Defendants' products (cigarettes).[2]

Although Mr. Harju's admissions and medical records alone establish the accrual of the statute of limitations and the untimeliness of his claims in this case, the additional undisputed fact that Mr. Harju was the plaintiff in a prior personal injury lawsuit filed in Arizona in 1992 against certain cigarette manufacturers (including many of the defendants in this case) further establishes the statute of limitations bar here.[3] Indeed, in that 1992 Arizona lawsuit, Mr. Harju claimed the same sort of cigarette-related injuries that are at issue in this lawsuit. Because all of Mr. Harju's claims in this case are barred by the statute of limitations, each claim should be dismissed.

Second, with regard to the lack of proof of causation, while Mr. Harju certainly had evidence of a causal connection between health problems generally and cigarettes by 1990 sufficient to trigger the accrual of the statute of limitations, Mr. Harju nevertheless still bears the burden of now proving that cigarettes actually and specifically caused his alleged injuries.[4] Because the alleged injuries in this case involve complex medical factors, the law requires that

---

[2] The Eighth Circuit has explained that, under Minnesota law, a claim involving personal injuries allegedly caused by a defective product accrues when two elements are present: "(1) a cognizable physical manifestation of the disease or injury, and (2) evidence of a causal connection between the injury or disease and the defendant's product, act, or omission." See Klempka v. G.D. Searle & Co., 963 F.2d 168, 170 (8th Cir. 1992) (citations omitted).

[3] See Affidavit of Michael R. Docherty in Support of Defendants' Motion for Summary Judgment ("Docherty Aff."), Exhibit 1 (Complaint for Products Liability, Superior Court for Arizona, Maricopa County, No. 92-10377, filed June 4, 1992) (hereinafter "1992 Arizona lawsuit"). Mr. Harju's 1992 Arizona lawsuit was later voluntarily dismissed by Mr. Harju. See Docherty Aff., Exhibit 2 (Mr.'s Harju's "Motion to Stay Action/Motion to Dismiss Action Without Prejudice" filed in his 1992 Arizona lawsuit). See also Docherty Aff., Exhibit 4 (Notice of Plaintiff of Joinder of Additional Plaintiff, Superior Court for Arizona, Maricopa County, No. 91-13556, filed May 4, 1992); Docherty Aff., Exhibit 5 (Amend Complaint, Superior Court for Arizona, Maricopa County, No. 91-13556, filed May 4, 1992).

[4] The standard for the accrual of the statute of limitations, see supra note 2, is different than the burden of proof that Mr. Harju bears to establish that the products at issue actually caused his alleged injuries.

Mr. Harju come forward with sufficient expert testimony to support the causation element of his claims. Mr. Harju, however, has not come forward with any expert witnesses, and his April 30, 2004 deadline to do so has passed. Because Mr. Harju cannot prove his claims without expert testimony as a matter of law, and because Mr. Harju has no expert witnesses, there is no genuine issue as to any material fact. Accordingly, Mr. Harju's claims should be dismissed.

## II. BACKGROUND FACTS

### A. Mr. Harju's Alleged Injuries Physically Manifested by 1990

In this case, Mr. Harju seeks to recover for a number of specific medical conditions, including: asthma, emphysema, COPD, chronic bronchitis, chronic sinusitis, irregular heart beat, restricted blood circulation, premature aging, reduced life expectancy and quality of life, and memory loss. See Complaint, at 5. The undisputed evidence, however, demonstrates that Mr. Harju knew that his alleged injuries physically manifested by 1990. In fact, the undisputed evidence demonstrates that some of his alleged injuries manifested even before 1990.

Mr. Harju's alleged heart problems first manifested no later than 1987. In April of that year, Mr. Harju filled out two release questionnaires while incarcerated in Arizona in which he claimed he had a "heart problem" or a "heart condition." See Docherty Aff., Exhibits 9 & 10 (April 14, 1987 and April 17, 1987 Release Questionnaires). By 1990, Mr. Harju's health condition allegedly worsened. Mr. Harju admits that by that time he was experiencing the following additional physical injuries or symptoms thereof: asthma, bronchitis, emphysema, shortness of breath (symptom of emphysema/COPD, bronchitis, asthma), trouble breathing (symptom of emphysema/COPD, bronchitis, asthma), wheezing (symptom of asthma), productive cough (symptom of chronic bronchitis), and sinus problems (symptom of sinusitis).

See Docherty Aff., Exhibit 8, pp. 260-268. At his deposition, Mr. Harju elaborated on the physical injuries he was experiencing in 1990:

> Q. . . . .What sort of problems, physical problems were you having in 1990?
>
> A. . . . . I was real short of breath and wheezing and everything. And they sent me to the hospital in Winslow, I think I remember, and they did X-rays and – and that and the doctors said I had pneumonia and bronchitis, because I was coughing up this yellow yuck and all this stuff . . . . But then sometime during 1990 – either a prison doctor or a doctor in Winslow or some doctor up there told me I had asthma and they put me on theophylline which made me sicker . . . . So as far as I knew, I had asthma all of a sudden. . . . And my sinuses were giving me problems . . . . I guess it was called allergic polyps or something . . . . That's what they said it was. I had surgery in 1990 on my sinuses for that . . . . But anyways, so, I lost weight and I got -- I got -- I thought I was going to die there for a while. But then, I got slowly better. I got over the pneumonia and that, but I still had the wheezing, especially at night. And then I would still – oh, I'd wake up sometimes at night, and I wouldn't be able to breathe, you know . . . . And it was like I was choking. . . .
>
> * * *
>
> The problem was I was also short of breath. I mean, I'd try to work out in the prison system, like pushing the wheelbarrows and – and – and shoveling or doing physical work, you know. And I noticed I couldn't run anymore. I'd get out of breath when I ran. And I'd get short of breath, you know. I started . . . noticing that I'd get short of breath. And it wasn't because I was having an asthma attack, you know. Eventually, I could tell the difference. And then I got shorter and shorter of breath. And in Tucson, when I was first there, I was -- I was having pretty bad problems. I -- sometimes I could hardly walk over to the medical unit or, you know. I was -- I was – you know, having real bad shortness of breath. . . . I can't remember if the doctors in Arizona mentioned COPD. I don't remember them talking about that. I don't remember -- I don't remember for sure if they said anything about having

emphysema, but I always complained about being short of breath, I remember.

Q. Well, in 1990, did you – I mean – is that what you thought you had?

A. What? They told me I had asthma. That's what I thought I had. They just said it's asthma. In fact, mostly, that's what I was told the whole time I was in prison in Arizona. One doctor said it's possible that there might be some emphysema involved, but he didn't say for sure definitely or not . . . . See Docherty Aff., Exhibit 8, pp. 260-268 (emphasis added).

Mr. Harju went on to further describe the physical problems he was experiencing in 1990:

Q. . . . . Do you know why in 1990 at that time the question of whether you had lung cancer was raised then?

A. Because I was having breathing problems. I don't know. The doctor sent me for X-rays. That's all I remember. I don't – I was thinking there's something wrong with my lungs. I – when I had the pneumonia, I thought I had cancer. I didn't correlate my pain in my back when I breathed to pneumonia. I had never had pneumonia. I never had breathing problems. I didn't know. I thought I had cancer or who knows.

Q. Why did you think you had cancer?

A. I just thought I had cancer from smoking. I figured people get cancer from smoking. I'm smoking, I – I got cancer, maybe. I don't know. I thought – I could -- it could have been anything. . . . See Docherty Aff., Exhibit 8, pp. 298-299 (emphasis added).

Mr. Harju's medical records further document the various physical injuries from which he has allegedly been suffering since at least 1990. For example, Mr. Harju's medical records document the following regarding Mr. Harju's condition:

02/21/1990: "c/o wheezing and trouble breathing"; "wheezing throughout". See Docherty Aff., Exhibit 11, p. 1[5]

[5] All medical records cited herein can be found in Docherty Aff., Exhibit 11. For ease of reference, page numbers have been added to the lower right hand corner of each medical record included in Exhibit 11.

04/04/1990: "Difficulty breathing". See Docherty Aff., Exhibit 11, pp. 2 – 3.

* * *

11/14/1990: "Suggestion of mild emphysema" on chest x-ray. See Docherty Aff., Exhibit 11, p. 4.

08/31/2000: "history of bronchial asthma and also emphysema for over 11 years now. He did have bronchial asthma as a child but then he used to smoke heavily and he had been diagnosed to have emphysema associated with his smoking, since 1989." See Docherty Aff., Exhibit 11, p. 5 (emphasis added).

* * *

04/01/1988: History of sinusitis noted; "c/o cig smoke causes sneezing". See Docherty Aff., Exhibit 11, pp. 6 – 7.

04/07/1988: Chronic sinusitis diagnosed. See Docherty Aff., Exhibit 11, p. 8.

09/12/1989: "Severe sinusitis". See Docherty Aff., Exhibit 11, p. 9 – 10.

12/27/1989: "c/o sinus infection". See Docherty Aff., Exhibit 11, p. 11.

* * *

05/23/1990: "Has medical slip from previous location of inside work – non-smoking environments. Hx of asthma." See Docherty Aff., Exhibit 11, p. 12.

In addition, handwritten notes authored by Mr. Harju further document his knowledge of his alleged injuries. In a September 1997 note, Mr. Harju details in his own writing a number of his claimed injuries and the dates by which he became aware of them:

- "Respiratory Disease diagnosed at ASPC-Winslow on 4-4-90 at ASPC – Winslow by Patricia Epps, PAC. (Emphysema, Asthma, Bronchitis)"
- "9/12/89 severe sinusitis"
- "12/27/89 sinusitis & Respiratory problems"
- "2/21/1990 Chronic Bronchitis & Asthma"

See Docherty Aff., Exhibit 6 (September 17, 1997 Handwritten Notes authored by Mr. Harju) (emphasis in original).

Further, in a 1997 submission to the Social Security Administration, Mr. Harju detailed the disabilities that he claims, in his words, "began in 1989-1990!". See Docherty Aff., Exhibit 7 (Notarized Letter to Social Security Administration & Attachments). In that submission, Mr. Harju claimed:

> I WAS DIAGNOSED AS HAVING RESPIRATORY DISEASE, (C.O.P.D.; EMPHYSEMA; ACUTE ASTHMA; AND CHRONIC BRONCHITIS ON: April 4, 1990, at ASPC-Winslow by Patricia Epps, PAC. Diagnosed with severe Costochondritis on April 6, 1990, at ASPC-Winslow . . . And, Chronic Sinusitis diagnosed on September 12, 1989. Disability began on or before April 4, 1990!!!

See id.

As set forth above, the undisputed evidence demonstrates that Mr. Harju knew that his alleged injuries physically manifested by at least 1990, if not earlier.

## B. Mr. Harju Had Evidence of a Causal Connection Between His Alleged Injuries and Cigarettes by 1990

The undisputed evidence also demonstrates that Mr. Harju had evidence of a causal connection between his alleged injuries and cigarettes by 1990.

### 1. Cigarette Package Warnings Provided Mr. Harju Evidence of a Causal Connection Between Cigarette Smoking and His Alleged Injuries

Mr. Harju began smoking in 1961. See Docherty Aff., Exhibit 8, p. 174:1-2. Importantly though, cigarette packages have contained health warnings since 1966. See Docherty Aff., Exhibit 12 (Surgeon General Warnings). Notably, since 1985, every package of cigarettes from which Mr. Harju obtained a cigarette contained one of the following four rotating warnings:

> SURGEON GENERAL'S WARNING: Smoking Causes Lung Cancer, Heart Disease, Emphysema, and May Complicate Pregnancy.
>
> SURGEON GENERAL'S WARNING: Quitting Smoking Now Greatly Reduces Serious Risks to Your Health.
>
> SURGEON GENERAL'S WARNING: Smoking by Pregnant Women May Result in Fetal Injury, Premature Birth and Low Birth Weight.
>
> SURGEON GENERAL'S WARNING: Cigarette Smoke Contains Carbon Monoxide.

Id.

When asked at this deposition about the rotating warnings that have been on cigarette packages since 1985, Mr. Harju admitted that he "was aware of the warnings." See Docherty Aff., Exhibit 8, pp. 377:8-9. Mr. Harju described his reaction to the rotating warnings:

> A. . . . . I mostly -- I remember seeing the one -- the Surgeon General's warning, "Quitting Smoking Now Greatly Reduces Serious Risks to Your Health" and then the first one there, "Surgeon General's Warning: Smoking Causes Lung Cancer, Heart Disease, Emphysema and May Complicate Pregnancy," those two I'm – I was more -- I'm aware – you know, I -- I was aware of them, and I -- I remember reading them.
>
> Q. When you first saw those in the 1980s, let's start with the first one that reads, "Smoking Causes Lung Cancer, Heart Disease, Emphysema and May Complicate Pregnancy," when you first saw that in the 1980s, what was your reaction?
>
> A. I was not too thrilled about being a smoker.
>
> Q. Why is that?
>
> A. Because it was kind of a scaring – you know, it was a pretty -- it was kind of alarming, you know. It kind of makes you think, you know –

Q. What does it make you think?

A. That cigarettes are going to kill you. . . . See Docherty Aff., Exhibit 8, pp. 377-378.

**2. Mr. Harju's Personal Experiences Provided Him Evidence of a Causal Connection Between Cigarette Smoking and His Alleged Injuries**

Over the years, Mr. Harju's awareness of the health risks associated with cigarette smoking came from a variety of sources, not just the package warnings discussed above. Indeed, by the age of 16 or 17, Mr. Harju was warned repeatedly by someone he knew about the health risks associated with cigarette smoking. Mr. Harju explained at his deposition:

A. [I]t would have been him [a Church elder] talking to us. It wasn't about us going up to him and saying hey, we're smoking. It was about him see[ing] us – he'd come in the store and see us sitting in the other room smoking, and then he'd come in there after he bought whatever he was buying, and he'd start lecturing us about how he'd lost a lung to lung cancer from smoking and, you know, commence to lecture us. Because he was from our church. And he – he knew we were from church. He -- I think he was, like, taught Sunday school or something. I don't remember for sure. But he was one of the church elders, like, and, you know, he would come in and lecture us on smoking. So --

Q. . . . . I get the sense that that wasn't a one-time occurrence; is that right?

A. No. It happened many, many times. Every time he came in there. See Docherty Aff., Exhibit 8, pp. 54-55.

In 1979, at about the age of 26, Mr. Harju testified he quit smoking one brand of cigarette because he "figured, you know, they're making [him] sick." See Docherty Aff., Exhibit 8, pp. 211:2-4.

By approximately 1986, the causal connection between cigarette smoking and emphysema – also noted on the cigarette packages – was reinforced for Mr. Harju when one of his family members died of emphysema. Indeed, Mr. Harju testified that he associated that family member's smoking habit with emphysema. Mr. Harju explained:

> Q. [A]t the time your wife's uncle passed away and you learned of that, did you associate his emphysema with his cigarette smoking?
>
> A. Yeah. I think -- I think – but I -- you know, it wasn't something I dwelled on. It wasn't something that I really would have paid a lot of attention to. But, yeah, yeah, I – I did associate that emphysema from his smoking.
>
> Q. Sure.
>
> A. We knew that's what was killing him, but it's like you think well, it's not going to happen to yourself, you know. Or you just kind of in denial. I think it's more like you're in denial. . . . See Docherty Aff., Exhibit 8, pp. 126-128.

In 1986, Mr. Harju also made an additional connection between cigarette smoking and heart problems when one of his friends had a heart attack associated with cigarette smoking. Mr. Harju explained:

> A. . . . . I had a friend -- I can't remember his name, Art maybe Smith. It was before I went to prison. He had bypass surgery on his heart, and his wife was telling him that he -- the doctor said he ain't allowed to smoke anymore.
>
> Q. Why did they say that?
>
> A. I guess 'cause of the heart attack. He had a heart, you know -- I guess he had blocked arteries. They did surgery on him, bypass surgery or something.
>
> Q. On his heart?
>
> A. Yeah. I remember he showed me the scar on his chest. I mean, they cracked his chest open. But, I remember he

would sneak out into the desert to smoke cigarettes, and I remember his – I – his wife complaining about it.

Q. And you heard about that before you went to prison in Arizona?

A. Yeah. That would have been in '86, yeah, sometime in '86. See Docherty Aff., Exhibit 8, pp. 257-258.

Further, by 1986, Mr. Harju also made a connection between cigarette smoking and problems associated with asthma. Mr. Harju testified at his deposition:

Q. During that occasion, when you stayed with your ex-wife and children in 1986, did you smoke around Jennifer?

A. No. Well, yeah, I did, but outside, not in the house.

Q. Why did you smoke outside and not in the house?

A. Because she had asthma.

Q. What did that have to do with your smoking?

A. I don't know. I guess I felt that she -- you know, smoking would bother her asthma or something. See Docherty Aff., Exhibit 8, p. 155.

By 1993, Mr. Harju's doctors would ask about his cigarette smoking "all the time" and would tell Mr. Harju that he should not smoke because of his health conditions. Mr. Harju testified that he tried to "conceal the fact that [he] was smoking again" from his doctors. Mr. Harju explained why he tried to conceal his smoking habit:

A. . . . . I didn't want the doctors and the officers to know I was smoking, 'cause the doctor would just give me hell.

Q. Why do you say that?

A. Because of my asthma and stuff. Said I shouldn't be smoking. And they'd ask you all the time, do you smoke? And I didn't want to tell them yeah. So – you know, even

though it's just a couple cigarettes a day, I still didn't want to tell them yeah. So, what I would do is I would either buy a pack and give it to my friend and bum one off of him once in a while or –

Q. How long was that your practice?

A. The whole time. I was trying to conceal the fact that I was smoking again.

Q. The whole time you were in the Arizona prison?

A. Just from 1993.

Q. Beginning in 1993?

A. Because, you know, the doctors would give me a rash of shit about it. And I was afraid they would cut my meds off. You know, you just got to be there to understand the situation, you know.

Q. What sort of things would they say to you about that?

A. Just a – they would just ask me if I was smoking.

Q. Uh-huh.

A. And I'd say no. And they wouldn't -- they wouldn't, you know, and they wouldn't say anything. But my friend, Larry, he had lung problems. And I'd even buy him a pack of cigarettes once in a while. When I think about it, it was not good. And they'd give him all this crap about it. They wouldn't give him treatments. Or they'd say you got to quit smoking or we're not going – this ain't going to do no good for you. You know, from what I seen what – how they were treating him, I wasn't going to tell them I was even smoking one cigarette a day. . . . [I]t was just like, you know, well, we're going to punish you now. But they'd threaten to do all kinds of stuff to him. So, I just didn't want to go there, you know. I seen what happened to other inmates.

* * *

Q. When did you first start noticing that happening to Larry?

A. [B]efore I even started smoking again. In – in '92 probably. See Docherty Aff., Exhibit 8, pp. 219-221.

### 3. Mr. Harju's Formal Education Provided Him Additional Evidence of a Causal Connection Between Cigarette Smoking and His Alleged Injuries

During high school, in approximately 1970, the health risks associated with cigarette smoking were emphasized for Mr. Harju at a school assembly. See Docherty Aff., Exhibit 8, pp. 661-663. Later, between 1988 and 1992, while an inmate in an Arizona prison, Mr. Harju took courses at a community college, in which the health risks associated with cigarette smoking were again emphasized for Mr. Harju. Mr. Harju explained the scope of those health lessons at his deposition:

Q. During those classes and others that you took in community college, were the health risks associated with cigarette smoking discussed?

A. Oh, yeah.

Q. What sort of things were discussed regarding the health risks associated with cigarette smoking during the time you were at Pima Community College between August of '88 and July of '92?

A. What I could remember, maybe, is about the risk of cancer and heart disease and stuff like that. I don't remember them talking about – I never knew what COPD was.

Q. Anything else?

* * *

A. Just generally the risk of heart disease and lung cancer and basically that, you know, and respiratory diseases. I think emphysema, but I don't remember them talking about – they might have talked about bronchitis, but I don't know. I don't think there was a lot discussed about smoking risks. I think it was more on other drugs. See Docherty Aff., Exhibit 8, pp. 664-665.

### C. Over Nine Years Before Commencing This Action, Mr. Harju filed A Products Liability/Personal Injury Complaint in Arizona Relating to His Alleged Cigarette-Related Injuries

In 1992, Mr. Harju filed a products liability/personal injury complaint, seeking relief for the same sort of injuries at issue in this case, against some of the same defendants named here, including Philip Morris and R.J. Reynolds Tobacco Co. See Docherty Aff., Exhibit 1. (Mr. Harju also named as defendants in that case other companies and certain Arizona prison officials.) In that 1992 Arizona lawsuit, Mr. Harju claimed:

> On or about April 1, 1988, continuously to present, in or about the prisons operated by the defendants, plaintiff, Joseph E. Harju, who is a nonsmoker has suffered physically and mentally from, and had his civil rights violated (in the form of lung and breathing problems, chronic asthma and emphysema) from defendants' negligent actions and tobacco products, that create secondhand tobacco smoke. See Docherty Aff., Exhibit 1, ¶ 15.
>
> * * *
>
> Strict liability in tort (negligence) that the defendants breached their expressed and implied warranties concerning the safety and merchantability of their tobacco products. See id. ¶ 22.
>
> * * *
>
> As a result of the plaintiff having inhaled a massive dose of secondhand tobacco smoke over a prolonged period, he has suffered chronic lung and breathing problems, infections, that have permanently damaged the health of the plaintiff. See id. ¶ 23.
>
> * * *
>
> Plaintiff is suffering chronic asthma and emphysema, the loss of life expectancy, a neurosis, mental and emotional distress from second hand smoke. See id. ¶ 24.

In a July 1992 motion prepared by Mr. Harju for his Arizona lawsuit, Mr. Harju made clear that he was claiming that cigarettes were the cause of his breathing problems at that time.

In that submission, Mr. Harju stated:

> Plaintiff's claims are based on injuries specific to this plaintiff as his Prison Medical Records would clearly indicate. That since his imprisonment, he has suffered respiratory injuries that "were NOT" present or Manifest previously. This is directly related to and caused by plaintiff's involuntary Exposure to Environmental (second Hand) Tobacco Smoke since his incarceration. Plaintiff has Early Stages of Emphysema and Asthma which were not present prior to his imprisonment.

See Docherty Aff., Exhibit 2 (Motion to Stay Action/Motion to Dismiss Action Without Prejudice). See also Docherty Aff., Exhibit 8, pp. 696-699 (Mr. Harju acknowledges that he prepared, signed and filed the Motion to Stay Action/Motion to Dismiss Action Without Prejudice in the 1992 Arizona case.).

Consistent with all the other undisputed evidence in this case, Mr. Harju's allegations from his 1992 Arizona lawsuit make clear that his alleged injuries physically manifested by the late 1980s or early 1990s, and that he believed cigarettes were the cause of the health problems. See id. ¶¶ 15, 22, 23, 24.[6]

---

[6] Mr. Harju failed to disclose his 1992 Arizona lawsuit against certain cigarette manufacturers in response to an interrogatory seeking information regarding his prior civil litigation. See Docherty Aff., Exhibits 12 & 14 (Mr. Harju's Interrogatory Responses & Supplemental Interrogatory Responses). Defense counsel, however, learned of the prior lawsuit during their preparations for Mr. Harju's deposition.

When confronted with the 1992 Arizona lawsuit at his deposition, Mr. Harju argued that he was somehow coerced into filing his prior lawsuit because he was "in fear for [his] life," because he was in prison on a ten-year sentence for child molestation and indecent exposure charges. During his deposition, Mr. Harju even went as far as to say that he "[doesn't] know what was claimed in [that lawsuit] back in 1992." See Docherty Aff., Exhibit 8, pp. 394-406, 420. See also Docherty Aff., Exhibit 13, p. 13 (detailing a portion of Mr. Harju's criminal history in Arizona, Minnesota, and Wisconsin).

Contrary to his attempt at his deposition to cover his tracks now, however, is a March 22, 1997 handwritten letter to a prison official authored by Mr. Harju while he was at another prison unit. In that letter, Mr. Harju affirmed (in his own handwriting) his knowledge of and personal commitment to the 1992 Arizona lawsuit. In his letter, Mr. Harju warned the prison official:

> Dear Sir:

## III. ARGUMENT

### A. Mr. Harju's Claims Are Barred by the Statute of Limitations Because His Alleged Injuries Physically Manifested by 1990, and He Had Evidence of a Causal Connection Between His Alleged Injuries and Cigarettes by that Time.

As noted above, Mr. Harju's claims are governed by a six-year statute of limitations. See Minn. Stat. §541.05, subd. 1.[7] The Eighth Circuit has explained that, under Minnesota law, a claim involving personal injuries allegedly caused by a defective product accrues when two elements are present: "(1) a cognizable physical manifestation of the disease or injury, and (2) evidence of a causal connection between the injury or disease and the defendant's product, act, or omission." See Klempka v. G.D. Searle & Co., 963 F.2d 168, 170 (8th Cir. 1992) (citations omitted). See also Narum v. Eli Lilly & Co., 914 F. Supp. 317, 320-21 (D. Minn. 1996) (noting that "cognizable" means "capable of being perceived or known") (citation omitted).

In this case, the statute of limitations began running when Mr. Harju became injured and had evidence that his injury may have resulted from cigarettes such that he could have

---

> Way back in 1992, I moved to dismiss my federal civil rights (42 U.S.C. § 1983) suit[] against the A.D.O.C., the director, and several tobacco companies, because I'd been moved here to an individual room here at Echo Unit, and therefore, was no longer exposed (involuntarily), to second hand ciggarett [sic] smoke. To avoid further litigation regarding this issue, please make sure that my current placement here at H.U. IA13, Echo Unit, (where I am not exposed to second hand tobacco smoke or evaporative coolers), remains the same until I'm released from A.D.O.C.? I have severe asthma. Thank you.
>
> /s/ Joseph E. Harju

See Docherty Aff., Exhibit 3.

Mr. Harju's claims now that he was allegedly coerced into filing his 1992 Arizona lawsuit and that he "didn't know what was claimed in [that lawsuit]" do not create a genuine issue as to any material fact.

[7] See Minn. Stat. § 541.05, subd. 1(5) (six-year statute of limitations "for any other injury to the person . . . not arising on contract").

maintained a cause of action for his injury. See Klempka, 963 F.2d at 170.[8] The full extent of the injuries did not need to be known for the statute of limitations to accrue. See Klempka, 963 F.2d at 170. Indeed, "[a] plaintiff who is aware of both [his] injury and the likely cause of [his] injury is not permitted to circumvent the statute of limitations by waiting for a more serious injury to develop from the same cause." Id.

The evidence detailed above demonstrates that Mr. Harju knew that he had a variety of physical injuries by 1990 or earlier, including the following: heart problems, asthma, bronchitis, emphysema, shortness of breath (symptom of emphysema/COPD, bronchitis, asthma), trouble breathing (symptom of emphysema/COPD, bronchitis, asthma), wheezing (symptom of asthma), productive cough (symptom of chronic bronchitis), and sinus problems (symptom of sinusitis). See Docherty Aff., Exhibit 8, pp. 260-268 & Exhibits 6, 7, 9, 10.

Indeed, as set forth above, Mr. Harju detailed a number of his claimed injuries and the dates by which he became aware of them in a September 1997 handwritten note:

- "Respiratory Disease diagnosed at ASPC-Winslow on 4-4-90 at ASPC – Winslow by Patricia Epps, PAC. (Emphysema, Asthma, Bronchitis)"
- "9/12/89 severe sinusitis"
- "12/27/89 sinusitis & Respiratory problems"
- "2/21/1990 Chronic Bronchitis & Asthma"

---

[8] See also Hermann v. McMenomy & Severson, 590 N.W.2d 641, 643 (Minn. 1999).

> A cause of action accrues and the statute of limitations begins to run when the cause of action will survive a motion to dismiss for failure to state a claim upon which relief can be granted. A cause of action survives a motion to dismiss so long as "some" damage has occurred as a result of the alleged [wrongdoing].

Id. (emphasis added).

See Docherty Aff., Exhibit 6 (September 17, 1997 Handwritten Notes by Mr. Harju) (emphasis in original). Similarly, in a 1997 submission to the Social Security Administration, Mr. Harju emphasized the disabilities that he claims, in his words, "began in 1989-1990!". See Docherty Aff., Exhibit 7. In that submission, Mr. Harju claimed:

> I WAS DIAGNOSED AS HAVING RESPIRATORY DISEASE, (C.O.P.D.; EMPHYSEMA; ACUTE ASTHMA; AND CHRONIC BRONCHITIS ON: April 4, 1990, at ASPC-Winslow by Patricia Epps, PAC. Diagnosed with severe Costochondritis on April 6, 1990, at ASPC-Winslow . . . And, Chronic Sinusitis diagnosed on September 12, 1989. Disability began on or before April 4, 1990!!!

See id.

Not only did Mr. Harju know about his alleged injuries by 1990, he had also been warned for decades about the health risks associated with cigarette smoking from a plethora of sources, as detailed above. Notably, Mr. Harju was aware of the various Surgeon General's warnings that have appeared on cigarette packages over the years, including the following warning that began appearing on cigarette packages in 1985: "SURGEON GENERAL'S WARNING: Smoking Causes Lung Cancer, Heart Disease, Emphysema, and May Complicate Pregnancy." As noted above, Mr. Harju remembered that warning because it "makes you think." See Docherty Aff., Exhibit 8, pp. 377-378. In addition, as discussed above, the health risks associated with cigarette smoking were emphasized for Mr. Harju over the years by family, friends, and through his formal education. See Docherty Aff., Exhibit 8, pp. 54-55, 126-128, 155, 219-221, 257-258, 377, 661-665.

Furthermore, by 1990, Mr. Harju's breathing problems were specifically connected to cigarettes by Mr. Harju himself and his physicians. At his deposition, Mr. Harju testified:

Q. . . . . Do you know why in 1990 at that time the question of whether you had lung cancer was raised then?

A. Because I was having breathing problems. I don't know. The doctor sent me for X-rays. That's all I remember. I don't – I was thinking there's something wrong with my lungs. I – when I had the pneumonia, I thought I had cancer. I didn't correlate my pain in my back when I breathed to pneumonia. I had never had pneumonia. I never had breathing problems. I didn't know. I thought I had cancer or who knows.

Q. Why did you think you had cancer?

A. I just thought I had cancer from smoking. I figured people get cancer from smoking. I'm smoking, I – I got cancer, maybe. I don't know. I thought – I could -- it could have been anything. . . . See Docherty Aff., Exhibit 8, pp. 298-299 (emphasis added).

See Docherty Aff., Exhibit 8, pp. 298-299. See also Docherty Aff., Exhibit 11, p. 5 (08/31/2000 medical record; "history of bronchial asthma and also emphysema for over 11 years now. He did have bronchial asthma as a child but then he used to smoke heavily and he had been diagnosed to have emphysema associated with his smoking, since 1989") (emphasis added); Docherty Aff., Exhibit 11, pp. 6 (04/01/1988 medical record; "c/o cig smoke causes sneezing"), Docherty Aff., Exhibit 11, p. 12 (05/23/1990 medical record; "Has medical slip from previous location of inside work – non-smoking environments. Hx of asthma"). In fact, in 1993, Mr. Harju started to conceal his cigarette smoking habit because of the, in his words, "rash of shit" his doctors would give him about cigarette smoking. See Docherty Aff., Exhibit 8, pp. 219-221.

The combination of Mr. Harju's cognizable injury by 1990, the federally-mandated package warnings, and other evidence of a causal connection between his injuries and the product was sufficient to place Mr. Harju on notice of the existence of a cause of action. See Tuttle v. Lorillard Tobacco Company, et al., No. Civ.99-1550(PAM/JGL), 2003 WL 1571584, at

*5 (granting summary judgment on the statute of limitations and noting that smokeless tobacco products have contained health warnings since 1987); Smith v. Brown & Williamson Tobacco Corp., 3 F. Supp. 2d 1473, 1475-76 (D.D.C. 1998) (dismissing claim against cigarette manufacturers as barred by statute of limitations; finding that the combination of injury and mandatory package warnings placed a reasonable person on notice of the existence of a cause of action).[9]

Indeed, the facts show that, by 1990, Mr. Harju was injured and had evidence that his injury may have resulted from cigarettes such that he could have maintained a cause of action for his injury. See Klempka, 963 F.2d at 170. In fact, Mr. Harju filed a lawsuit in June 1992 against certain cigarette manufacturers seeking relief for his alleged injuries. (As noted above, Mr. Harju later voluntarily dismissed that lawsuit in July 1992.) See Docherty Aff., Exhibits 1-3. Mr. Harju, however, did not file this lawsuit until December 7, 2001. Because Mr. Harju's causes of action accrued at least eleven years before his complaint was filed in this Court, his

[9] In State of Minnesota v. Philip Morris, Court File No. C1-94-8565, Judge Fitzpatrick entered an unpublished order on January 24, 1998. See Docherty Aff., Exhibit 15. That Order, which was never subject to appeal because the case was settled, denied Defendants' motion for summary judgment based on the statute of limitations. For the following reasons, that Order is, at a minimum, inapposite to the facts of this case: (1) State of Minnesota did not involve a claim for personal injury as in this case; instead plaintiffs sought the increase in health costs allegedly related to smoking which was caused by defendants' alleged fraudulent concealment; (2) Judge Fitzpatrick's primary focus was on plaintiffs' cause of action for fraud and fraudulent concealment; there are no such claims remaining in this case; (3) the relevant issue before Judge Fitzpatrick was whether sufficient information existed by 1988 or 1990 (depending on the cause of action) to support summary judgment. To the extent the January 24, 1998 Order provides any guidance, it actually supports a grant of summary judgment for the defendants in this case. In relevant part, Judge Fitzpatrick found there was testimony of an "'explosion of information' throughout the first half of 1994" to support the claims made in the State of Minnesota suit, and that press reports "document disclosures of tobacco company wrongdoing in the months just before the filing of [the State of Minnesota lawsuit] in August 1994" as well as "reported unprecedented disclosures of information and ground-breaking investigations of tobacco industry misconduct by the FDA, the FTC, the media, the Surgeon General, the Attorney General, and the Waxman Committee[.]" Although Judge Fitzpatrick's Order is not controlling in this personal injury case, it makes clear there that was sufficient information in the public domain to put Mr. Harju on notice of alleged misconduct more than six years prior to the commencement of this action.

claims are barred by the six-year statute of limitations, and should be dismissed with prejudice.

**B. Mr. Harju's Claims Also Fail Because He Lacks the Required Proof of Causation.**

Although, as discussed above, Mr. Harju certainly had evidence of a causal connection between his alleged injuries and cigarettes by 1990 sufficient to trigger the accrual of the statute of limitations, Mr. Harju nevertheless still bears the burden of proving by a preponderance of the evidence that cigarettes actually caused his specific injuries. See Goeb v. Tharaldson, 615 N.W.2d 800, 817 (Minn. 2000) (recognizing that evidence of causation is an essential element of a tort action). Importantly though, expert testimony is required under Minnesota law to prove causation when the case involves complex medical factors that are outside the realm of the average juror's knowledge. See Gross v. Victoria Station Farms, Inc., 578 N.W.2d 757 (Minn. 1998). Indeed, this Court has recognized:

> Under Minnesota law, "Where the question involves obscure and abstruse medical factors such that the ordinary layman cannot reasonably possess well-founded knowledge of the matter ... there must be expert testimony that the thing alleged to have caused the result not only might have done so, but in fact did cause it."

See Willert v. Ortho Pharmaceutical Corp., 995 F. Supp. 979, 983 (D. Minn. 1998) (citation omitted); see also Bernloehr v. Central Livestock Order Buying Co., 208 N.W.2d 753, 755 (Minn. 1973).

In this case, Mr. Harju seeks to recover for a number of specific medical conditions, including: asthma, emphysema, COPD, chronic bronchitis, chronic sinusitis, irregular heart beat, restricted blood circulation, premature aging, reduced life expectancy and quality of life, and memory loss. See Complaint, at 5. Mr. Harju has the burden to prove that he, in fact, has these injuries and that Defendants' products caused the injuries. Importantly though, to establish liability, Mr. Harju is required to go beyond diagnosis to the more precise inquiry of what caused

his disease, normally the subject of a hotly contested matter, supported by expert witness testimony. Both of these inquiries involve complex medical and scientific determinations.[10] Establishing the cause of these alleged medical conditions will necessarily involve a complex, multi-factored assessment of risk factors that can only be made by expert medical witnesses. Accordingly, Mr. Harju cannot establish causation in this case without expert testimony.

Mr. Harju's deadline for designating expert witnesses in this case was April 30, 2004. See December 1, 2003 Pretrial Schedule, Docket Entry No. 72. Mr. Harju, however, failed to designate any expert witnesses. Because Mr. Harju cannot present the necessary expert testimony to establish causation of the complex diseases at issue in this case, there is no genuine issue as to any material fact, and the Court should enter summary judgment in favor of Defendants. See Fed. R. Civ. P. 56(c).

## IV. CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss Plaintiff's remaining claims, in their entirety, with prejudice.

---

[10] See generally Docherty Aff., Exhibit 16 (Dorland's Illustrated Medical Dictionary, 28th edition. Philadelphia: WB Sanders Company; 1994) (indicating that asthma can be provoked by allergies and by "a variety of factors, including vigorous exercise, irritant particles, psychologic stresses, and others"); Docherty Aff., Exhibit 17 (Higgins, I. T., "Epidemiology of bronchitis and emphysema" Fishman's Pulmonary Diseases and Disorders 2nd Ed., Jeffers, J.D., Navrozov, M., Eds., 2 (76): 1237-1246; 1988) (indicating that emphysema, COPD, and chronic bronchitis can be caused by a number of different factors, including smoking, air pollution, indoor pollution, occupational exposures, heredity, infection, and miscellaneous other factors); Docherty Aff., Exhibit 18 (Hopkins, P.N., Williams, R.R., "A Survey of 246 Suggested Coronary Risk Factors" Atherosclerosis 40: 1-52; 1981) (indicating that there are 246 risk factors for irregular heart rate, vascular disease, and heart disease); Docherty Aff., Exhibit 19 (Settipane, R.A., and Lieberman, P., "Update on Nonallergic Rhinitis," Ann Allergy Asthma Immunol 86: 494-508, 2001) (indicating that chronic sinusitis can be caused by exposure to tobacco smoke, pollution, paint fumes, garden sprays, formaldehyde, sulfur dioxide, and ozone, among other irritants and allergens).

Respectfully submitted,

RIDER BENNETT, LLP

By **s/ Michael R. Docherty**

Dated: June 3, 2004

Michael R. Docherty (16690X)
333 South Seventh Street, Suite 2000
Minneapolis, MN 55402
(612) 340-8930

**Attorneys for Defendant Lorillard Tobacco Company**

and

By s/**Edward Magarian**
Edward Magarian (208796)
Dorsey & Whitney LLP
50 S 6th St Ste 1500
Minneapolis MN 55402-1498
(612) 340-2600

**Attorneys for Philip Morris USA Inc.**

and

Robert V. Atmore (003438)
Lindquist & Vennum P.L.L.P.
80 S 8th St Ste 4200
Minneapolis MN 55402-2205
(612) 371-3211

**Attorneys for Liggett Group, Inc.**

and

Jack M. Fribley (31999)
Faegre & Benson LLP
2200 Norwest Ctr
90 S 7th St
Minneapolis MN 55402-3901
(612) 766-7000

**Attorneys for Brown & Williamson Tobacco**

and

Christopher V. Cotton (*pro hac vice*)
Shook, Hardy & Bacon, L.L.P.
2555 Grand Blvd
Kansas City, MO 64108
(816) 474-6550

**Attorneys for Philip Morris USA Inc. and Lorillard Tobacco Company**

and

James Simonson (101333)
Gray, Plant, Mooty, Mooty & Bennett, P.A.
500 IDS Ctr
80 S 8th St
Minneapolis MN 55402
(612) 632-3000

**Attorneys for R.J. Reynolds Tobacco Company**

1136582-1