UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Civil File No. CV 01-2336 (DWF/RLE)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JOSEPH EDWIN HARJU,

Plaintiff,

v

PHILIP MORRIS USA, INC.,
R.J. REYNOLDS TOBACCO COMPANY,
LORILLARD TOBACCO COMPANY,
LIGGET GROUP, and BROWN & WILLIAMSON,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF BRENDA HARJU

Taken by the Defendants on the 12th day of May, 2004, at AmericInn, 56925 South 6th Street, Calumet, Michigan, at 9:00 a.m.



VDC6B8264

Q When was it that Mr. Harju entered the Army Reserves?
A When we moved to Duluth. That May he transferred to the Army Reserves.
Q So Mr. Harju began Army Reserves in May 1974 when you two moved to Duluth?
A Yes.
Q During the time that you lived in Duluth, what jobs did Mr. Harju have beginning in May of '74?
A We were on welfare for a short time there. We first moved there, we got on welfare. He had a job -- I know he had a job called Westinghouse in Duluth. That was mid 70s until about 1980. I don't remember dates.
Q Okay. I understand. This is very difficult. I totally understand. What type of work did Mr. Harju do at Westinghouse between the mid 1970s and approximately 1980?
A He made parts for machines. I don't know what kind of machines.
Q Did he work in a factory?
A I think it was a factory.
Q Were there any other jobs after his job at Westinghouse that you can recall Mr. Harju having up until the time that you divorced?
A No.
Q We've gone through a lot of dates today, Ms. Harju, and I understand how difficult it can be, and it is possible that



some of your dates might be a little bit off; is that correct?
A Yes.
Q For instance, you mentioned that you might have seen Mr. Harju in 1990 or 1991, correct?
A Yes.
Q And if Mr. Harju was incarcerated during that time, you would not have seen him?
A No.
MR. WALDEN: Well, I believe that's all the questions I have for right now. I'd like to turn it over to my colleagues. They might have a few follow-up questions for you.
THE WITNESS: Okay.
MR. WALDEN: Thank you very much.
MR. COTTON: Mrs. Harju -- or Ms. Harju, I should say, I introduced myself earlier. Again, I'm Chris Cotton, and I'm here today on behalf of Philip Morris. Mr. Walden did his usual thorough job, so I don't have a whole lot to follow up on, but I have a few questions I want to ask you. I may jump around a little bit, and if at any time, you don't understand a question I ask, will you let me know?
THE WITNESS: Yes.
CROSS-EXAMINATION
BY MR. COTTON:



Q I think earlier you indicated that you spoke with Mr. Harju, your ex-husband, sometime last week; is that right?
A Yes.
Q And so he knew that we were going forward with the deposition this morning, today, right?
A Yes.
Q I think you indicated, too, that during that conversation with your ex-husband last week, he said that he had read up on tobacco companies; is that right?
A Yes.
Q What did he mean by that? Did he explain what he had read up on and anything along that line?
A He got information, I'm not sure, on the Internet or wherever he gets information from.
Q Did he indicate what the nature of that information was?
A He told me a lot about the information about smoking and how many people die and how many people have it, and --
Q Have what?
A Have -- what did he use? -- have, like, emphysema or chronic breathing problems. He tried to tell me how many millions of people have it and have breathing problems.
Q Now, was that the first time you'd ever talked with your ex-husband about those sort of issues?
A Yes.
Q And how long did that conversation last?



A He talked for a good 45 minutes.
Q I get the sense from some of your earlier testimony today that you and your ex-husband were not real talkative during your relationship; is that right?
A That's right.
Q Did it surprise you that he spent 45 minutes talking to you about those issues last week?
A Yes.
Q Was it more him talking and you listening or was there much of an exchange?
A He talked.
Q And you just listened?
A I listened.
Q And when he talked, he was talking about how bad cigarettes are; is that right?
A Yes.
Q Did he suggest that tobacco companies are bad?
A Yes.
Q What did he say about that?
A He said that over the years he was smoking that he never knew about how bad it was for him. He didn't learn about it until it was too late, and he was saying that the cigarette companies should have informed people about cigarette smoking and how bad it is.
Q But you're aware, aren't you, that cigarette packages have





W0C6B8284

82

had health warnings since the mid 1960s, right?
A I -- I've read that on cigarette packages. I didn't know when it started though.
Q When your ex-husband Joseph was telling you all this stuff about cigarettes and cigarette companies, what was your reaction? What were you thinking?
A I did not know about how -- how many people have it. He was giving me numbers of people who have it, breathing problems, and they're saying through cigarette smoking. I was -- you know, I learned something.
Q Why do you think it was he was telling you all that for 45 minutes?
A Because he's planning on suing.
Q And he knew about your deposition today?
A Yes, he did. He told me to tell the truth and he must have, you know -- I don't know what he's thinking.
Q Sitting here today, obviously, you don't know what Joseph was thinking then, but sitting here today, why do you think Joseph called you a week before your deposition and talked to you for about 45 minutes about cigarettes and cigarette companies?
A He wants me to -- he thinks he wants me to say something about his health problems.
Q Did he encourage you to say some things?
A At first he told me, "Don't talk to them at all." I don't

83

have to talk to them at all.
Q At the deposition?
A Yes.
Q And what was your response to that suggestion?
A I told him, "Well, I don't know anything about the court system." I said that I was subpoenaed to talk Wednesday morning, and I'm going to be there.
Q Well, we certainly appreciate your coming. What was his response when you made it clear to him that -- well, strike that. When did he indicate to you that you didn't need to come today? Was that early in the conversation? Towards the end of the conversation?
A More towards the middle when he was telling me about what's going on, and I said, "Well, I got a subpoena to talk." I told him right out, you know, "I'm going to be here," and that was it. I mean, he couldn't talk me out of it or nothing.
Q After you made it clear to Joseph that you were going to attend the deposition notwithstanding his suggestion that you didn't or don't, what did he say then?
A He just said, "Well, tell the truth then."
Q Did he go on to talk about the things, if anything, he wanted you to say?
A No. I told him that I don't remember much about us being married, I said, and that was many years ago, and I just

84

blocked -- you know, got on with my life, so I said, "I don't remember," and he was bringing up things in our marriage, and I was saying, "I don't remember that."
Q What sort of things was he bringing up?
A He was bringing up stuff, like, when he was smoking, and I said, "I don't remember that." And he was saying, "Yeah, yeah, you know, we -- I used to smoke." I knew -- I remember him smoking, but --
Q Was he trying to encourage you to remember some things that you didn't remember?
A Oh, yeah.
Q What was he trying to encourage you to remember that you just don't remember?
A That he smoked a lot. I said, "Well, I don't remember you smoking a lot." I never kept track, you know. I was busy with the girls.
Q What other things did your ex-husband Joseph encourage you to remember that you simply don't remember?
A How many cigarettes he did smoke. I -- I never kept track of how many cigarettes he smoked.
Q Anything else?
A Right now, I can't think of anything right now.
Q Sure. Did he encourage you to remember anything about his health condition over the years?
A When we were married?

85

Q Well, at any time, but I mean during this conversation. I'm focusing in on the things that were discussed last week when your husband Joseph called you and you spoke for 45 minutes. During that conversation, I want to get a sense of the other sort of things he tried to encourage you to remember, and one of the things I'm wondering is did he talk to you or encourage you to remember anything about his health condition over the years?
A Not while we were married, but when he talked to me over the last ten, 20 years after we were married, he was saying his health has gone downhill.
Q So during your conversation with Joseph Harju last week, he said to you that over the last ten to 20 years, his health has gone downhill; is that right?
A Yes.
Q What did Joseph Harju, your ex-husband, say about the nature of his health problems that he started to experience 20 years ago?
A Well, he didn't say exactly when, you know, 20 years ago, but --
Q Well, let me ask you this then: What health problems did Joseph tell you that he's been experiencing over the last ten to 20 years associated with his cigarette smoking habit?
A He has asthma. They said he has asthma, just hard breathing.





W0C6B8285

86

Q Any other problems?
A No, he didn't mention any other health problems.
Q And those are two things that you didn't recall; is that right, the asthma and the hard breathing?
A Recall when?
Q Well, was that one of the things that he was helping you remember that you didn't remember, or is that something that you actually do remember?
A No, I didn't know that.
Q But nevertheless, during your conversation last week, Joseph Harju was describing the asthma and breathing problems that he's had for the last ten to 20 years; is that right?
A Yes.
Q And for that ten- to 20-year period, he's associated those problems with his smoking habit; is that right?
A That's what he says, yes.
Q How did you feel when Mr. Harju was -- well, strike that. Did you feel like Mr. Harju was pressuring you at all during that conversation last week?
A Yes.
Q In what way?
A Well, first when he was telling me not -- I didn't have to talk, you know, talk to no one, and then -- and then he's telling me to, you know, be honest, and, you know, I said, "Well, yeah, I will be honest." It seemed like he really

87

wanted to get going on this suing stuff, and I felt, you know, angry that he's doing this. I mean, I didn't think he would do something like this.
Q What other sorts of things did Joseph, the plaintiff in this case, say to you during that conversation last week that made you feel pressured?
A Not much about the suing part, but he said he's broke, and he asked if I would get a hold of my oldest daughter or somebody that could help him out for the next couple months. He's really broke.
Q Did he indicate that -- that he expects to get some sort of money out of this lawsuit?
A No, he didn't say that.
Q Did you understand that he was talking to you about or trying to help you recall things in an effort to help his case?
A Oh, yeah, I'm sure, you know.
Q Why do you say that?
A Well, just like when we were married, he was -- you know, just what he was saying about you remember this, that, and I used to smoke and just trying to -- yeah, he was trying to recall stuff about when we were married.
Q But you don't recall -- well, strike that. During your conversation last week, Joseph Harju tried to help you remember that he smoked a lot, right?

88

A Yes.
Q And you don't remember that, do you?
A I didn't keep track, no. I didn't keep track of his cigarette smoking.
Q Did he get upset when you wouldn't recall something like that?
A I didn't feel that he was upset. I told him that I -- it's been years. You know, I told him right out I didn't remember a lot of our stuff in our marriage or I blocked it out, you know, after a while. It's been years now.
Q I think you indicated that he wanted to contact one of your daughters about getting some sort of support for the next couple months.
A Yes.
Q Does he expect some sort of other income a couple months from now, do you know?
A SSI.
Q Has he been approved for disability benefits?
A Not yet.
Q Did he indicate what he was going to do to try to get benefits along that line?
A He must have put paperwork going for it.
Q Did he talk about it at all?
A He was saying that he's hoping to get SSI soon, still waiting.

89

Q Is he working now?
A No.
Q Do you have any sense of what he's doing with himself during the day?
A No.
Q Are you aware of anything that's preventing him from working?
A No.
Q I think you indicated that during your conversation with Joseph Harju last week that he told you that you didn't have to come to this deposition.
A Yes.
Q What did he say in support of that argument or that position or that opinion that he had? Did he explain why he didn't think you needed to show up?
A He said that it was a civil case and that it's not that important for me to say anything.
Q Did he indicate why he thought that?
A No.
Q Did he say anything about that topic, that is, encouraging you not to participate in this deposition notwithstanding the subpoena?
A The law. I don't know.
Q Did he talk about the law?
A Not really the law, just that it's a civil case, he said,

and it's not that important. I don't know. I don't know the law.
Q What was he saying was not that important?
A For me to talk here.
Q I think too you indicated a little bit ago that you are angry that he's doing this.
A Yes. I don't believe in suing.
Q You're angry that he's suing the tobacco companies?
A Yes.
Q Why are you angry that he's suing tobacco companies?
A He should have known.
Q What do you mean?
A He should have known that cigarettes are bad for him. I mean, I suppose cigarette smoking is a habit like drinking or gambling or something.
Q But as far back as you can remember --
A He has no right.
Q He has what?
A He has no right to sue. Nobody has a right to sue unless it -- I don't know how it goes.
Q Well, do you consider cigarette smoking a matter of personal choice?
A Yes.
Q And as far back as you can remember, you've known about the various health risks associated with cigarette smoking,



right?
A Yes, for many years.
Q And, in fact, as far back as you can remember; is that right?
A Yes. My parents smoked.
Q And growing up seeing your parents smoking, you didn't want to smoke, correct?
A Yes.
Q And why was that?
A I must not have liked the smoke in a small apartment that we had.
Q I think you indicated that you didn't think Joseph Harju would do something like this, that is file a lawsuit, right?
A Yes.
Q Why do you say that?
A He's not a bad guy. He's -- I didn't think he would be a person to sue. I thought he was raised, you know, half decent, and he was a decent guy to a point, you know, of not suing someone. Suing ain't the nicest thing to me. I don't think suing is very good.
Q A moment ago, we were talking about your understanding of the health risks associated with cigarette smoking. Do you recall that?
A Yes.
Q And again you can't remember any time where you've not been



aware of the health risks associated with smoking, right?
A Yes.
Q And you consider cigarette smoking a matter of personal choice, right?
A Yes.
Q And you also indicated that you consider the various health risks associated with smoking, cigarette smoking, a matter of common knowledge?
A Yes.
Q What percent of responsibility do you think Joseph Harju, the plaintiff in this case, bears for any injuries he might have suffered allegedly related to cigarette smoking?
A Okay. Say that over again.
Q Sure. We've already talked about the common knowledge of the risks associated with smoking, right?
A Yes.
Q And we've already talked about the fact that you consider cigarette smoking a matter of personal choice, right?
A Yes.
Q And my question now is what percent of responsibility do you think the plaintiff, Joseph Harju, bears for any alleged injuries he suffered from cigarette smoking?
A A hundred percent.
Q Now, earlier I indicated that cigarette packages have had health warnings on them since the mid 1960s. You don't



recall specifically when those warning went out, right?
A No.
Q But you're nevertheless aware that cigarette packages have had warnings for decades, right?
A Yes.
Q Did you ever discuss those package warnings with Joseph Harju?
A No.
Q Do you know if any -- strike that. Did you ever go to any doctor's appointments with Joseph?
A No.
Q Do you know if any doctors ever encouraged him to quit or cut back on cigarette smoking?
A No.
Q If you had told Joseph Harju, the plaintiff in this case, to quit smoking during your marriage because smoking is bad for his health and could kill him, what do you think his reaction would be?
A At that time, he probably would have said, "Yeah, right. You're wrong."
Q Is Joseph Harju someone that does what he wants to do?
A Yes.
Q Is Joseph Harju someone that if he doesn't want to do something, he won't do it?
A I don't know.





W0C6B8287